IN THE SUPREME COURT OF NORTH CAROLINA

No. 234A13

FILED 12 JUNE 2014

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; VIRGINIA ELECTRIC AND POWER COMPANY d/b/a DOMINION NORTH CAROLINA POWER, Applicant; and PUBLIC STAFF – NORTH CAROLINA UTILITIES COMMISSION, Intervenor

v.

ATTORNEY GENERAL ROY COOPER and NUCOR STEEL-HERTFORD, Intervenors

On direct appeal as of right pursuant to N.C.G.S. §§ 62-90(d) and 7A-29(b) from a final order of the North Carolina Utilities Commission entered on 21 December 2012 in Docket No. E-22, Sub 479.  Heard in the Supreme Court on 19 November 2013.

*McGuireWoods, LLP, by James Y. Kerr, II, for applicant-appellee Virginia Electric and Power Company d/b/a Dominion North Carolina Power.*

*Antoinette R. Wike, Chief Counsel, and William E. Grantmyre and Dianna W. Downey, Staff Attorneys, for intervenor-appellee Public Staff – North Carolina Utilities Commission.*

*Kevin Anderson, Senior Deputy Attorney General; Phil Woods, Special Deputy Attorney General; Margaret A. Force, Assistant Attorney General; and William V. Conley, Special Deputy Attorney General, for intervenor-appellant Roy Cooper, Attorney General.*

*Nelson, Mullins, Riley & Scarborough, LLP, by Joseph W. Eason and Phillip A. Harris, Jr.; and Brickfield, Burchette, Ritts & Stone, P.C., by Damon E. Xenopoulos, pro hac vice, for intervenor-appellant Nucor Steel-Hertford.*

JACKSON, Justice.

In this case we consider whether the North Carolina Utilities Commission ("the Commission") erred by approving certain adjustments made by Dominion North Carolina Power ("Dominion") to a study of the costs of providing retail electric service to a large industrial customer. In addition, we consider whether the order of the Commission, which authorized a 10.2% return on equity ("ROE") for Dominion, contained sufficient findings of fact to demonstrate that it was supported by competent, material, and substantial evidence in view of the entire record. We conclude that the Commission did not err by approving Dominion's adjustments to the cost-of-service study; however, we reverse that portion of the Commission's order in which it authorized a 10.2% ROE for Dominion and remand for additional findings of fact in light of *State ex rel. Utilities Commission v. Attorney General Roy Cooper* ("*Cooper*"), 366 N.C. 484, 739 S.E.2d 541 (2013).

On 30 March 2012, Dominion filed an application with the Commission requesting authority to increase its retail electric service rates to produce an additional $63,665,000—an increase of approximately 19.11% in overall base revenues. Subsequently, Dominion reduced its proposed revenue increase to $55,320,000 and requested an ROE of 11.25%. The ROE represents the return that a utility is allowed to earn on its capital investment by charging rates to its customers. As a result, a higher ROE impacts profits for shareholders and costs to consumers. *Id.* at 485 n.1, 739 S.E.2d at 542 n.1. The ROE is one of the components used in determining a company's overall rate of return. *State ex rel.*

*Utils. Comm'n v. Public Staff* ("*Public Staff III*"), 323 N.C. 481, 490, 374 S.E.2d 361, 366 (1988).

In this case the Commission allowed petitions to intervene filed by Nucor Steel-Hertford ("Nucor"), the Carolina Industrial Group for Fair Utility Rates, the North Carolina Sustainable Energy Association, and the North Carolina Waste Awareness and Reduction Network. Nucor is a large industrial customer of Dominion. The Attorney General and the Public Staff of the Commission intervened as allowed by law. *See* N.C.G.S. §§ 62-15, -20 (2013).

On 27 April 2012, the Commission entered an order declaring this proceeding a general rate case and suspending the proposed new rates for up to 270 days. The Commission scheduled four public hearings to receive testimony from public witnesses. The Commission also scheduled an evidentiary hearing for 16 October 2012, at which additional public testimony as well as expert testimony would be received.

During the course of the hearings, the Commission heard testimony from twenty public witnesses and a number of witnesses presented by the parties. The Commission also received evidence addressing the methodology used in Dominion's cost-of-service studies. Cost-of-service studies are used to allocate production and transmission plant costs among multiple jurisdictions and customer classes. Dominion is required to submit such studies annually to the Commission.

Dominion used the summer and winter peak and average method ("SWPA"), with a test period ending 31 December 2011, for its original study. The SWPA method models cost of service using two factors: a peak demand component and an average demand component. The peak demand component accounts for the power consumed during the hour when demand for electricity is highest in the summer and winter months. Average demand is calculated using the total power provided during the year, divided by the number of hours in the year. To determine the cost of providing service to a particular customer class, the peak and average demands for that class are weighted using a value called the system load factor, which represents whether the customer class uses more power during peak or off-peak periods. The effect of the system load factor is to allocate base load production costs to customer classes that use power during off-peak hours and peak production costs to customer classes that use power during peak hours.

Nucor operates an electric arc furnace. During the test period, Nucor consumed 21% of all electricity sold by Dominion in North Carolina. Nucor's maximum peak demand was 158 megawatts ("MW"), and its average demand was 104 MW; however, in its original cost-of-service study, Dominion reduced Nucor's peak demand component to 38 MW. This reduction reflected that Dominion has a contractual right to interrupt Nucor's power use for limited periods. The contract between the companies provides for several types of interruption that place conditions on Nucor's use of electricity. During a period of interruption, Nucor may

purchase electricity pursuant to special price terms, depending upon the type of interruption Dominion has requested. Also, depending upon the type of interruption, Nucor may or may not be allowed to use this electricity to operate its electric arc furnace.

Nucor offered the testimony of Dr. Dennis Goins, Economic Consultant with Potomac Management Group, who recommended additional adjustments to the treatment of Nucor in the cost-of-service study. Goins's primary recommendation was to treat the entirety of Nucor's demand as interruptible or "non-firm." Goins testified that interruptible service should not cause Dominion to incur any production capacity costs, so no production capacity costs should be allocated to Nucor. In the alternative, Goins recommended that Dominion should reduce Nucor's average demand in the same manner that it adjusted Nucor's peak demand.

Dominion witness Paul B. Haynes, Manager, Regulation for Dominion, strongly opposed these proposals. Haynes noted that Goins's primary recommendation would assign no responsibility for production plant costs and other costs to Nucor. He testified that this proposal would reduce the revenue requirement assigned to Nucor by $11.5 million, but increase the revenue requirement assigned to the residential class by $900,000. Haynes argued that Goins's secondary proposal was unfair because all other customer classes' average demand factors were calculated using the amount of energy they actually consumed.

Haynes testified that the proposal would ignore 63% of the energy Nucor actually consumed, and it would potentially shift costs to other jurisdictions and adversely affect other customer classes.

The Commission heard additional testimony concerning Dominion's ROE. Dominion presented the testimony of Robert Hevert, Managing Partner of Sussex Economic Advisors, LLC, Inc. Hevert testified that in developing his ROE recommendation, he relied primarily on the Constant Growth Discounted Cash Flow ("DCF") model, which estimates the ROE as the sum of expected dividend yield and expected rate of dividend growth. Hevert also considered the Capital Asset Pricing Model ("CAPM"), which estimates cost of equity as the expected return on a risk-free investment plus a risk premium. Hevert further testified that because Dominion is not publicly traded, it was necessary to perform the analysis on a proxy group of publicly-traded companies comparable to Dominion. On direct examination he recommended an ROE range of 10.75% to 11.50%; however, on rebuttal he modified the range to 10.50% to 11.50%, with a specific recommendation of 11.25%. He criticized the ROE recommendations of Public Staff witness Johnson and Nucor witness Woolridge because he believed that their recommendations were excessively low considering the 10.7% ROE authorized for Dominion in its last general rate case order of 13 December 2010.

The Public Staff presented the testimony of Dr. Ben Johnson, Consulting Economist and President of Ben Johnson Associates, Inc. Johnson used a market approach and a comparable earnings approach to estimate Dominion's cost of equity. Johnson's market approach included an analysis of historic market returns earned by investors in publicly traded common stocks, a DCF analysis, and a CAPM analysis. Johnson testified that the average regulated utility often has a significantly lower cost of equity than an average unregulated, competitive firm because public utilities have substantially less risk. In performing his analysis, Johnson selected a different proxy group from that utilized by Hevert. Johnson argued that Hevert's proxy group improperly selected companies that were enjoying better-than-average financial performance and a lower-than-average risk profile. Johnson also testified that Hevert had relied solely upon data concerning projected earnings per share growth, which he characterized as more subjective and less reliable. Johnson's market approach estimated a cost of equity range of 7.89% to 9.08%, and his comparable earnings approach estimated that Dominion's cost of equity was in the range of 9.75% to 10.75%. He suggested that the Commission could average the upper and lower bounds of each range to create a composite range of 8.82% to 9.91%. He further recommended that the Commission exercise discretion in determining how much weight to put on each of his approaches. Assuming equal weight, he recommended a 9.37% ROE.

Nucor presented the testimony of Dr. J. Randall Woolridge, finance and business administration professor at the University Park Campus of Pennsylvania State University, Director of the Smeal College Trading Room, and President of the Nittany Lion Fund, LLC. Woolridge testified that he, like Hevert, had applied both the DCF and CAPM approaches; however, Woolridge testified that Hevert had included only ten companies in his proxy group, while Woolridge had included thirty-six. Woolridge also criticized Hevert's analysis for relying solely upon projected earnings per share growth rates because he stated that those estimates are overly optimistic and upwardly biased. Woolridge's DCF analysis estimated that the cost of equity was 8.5% for his proxy group and 8.6% for Hevert's proxy group. Woolridge testified that for both proxy groups, his CAPM analysis estimated the cost of equity at 7.5%. He concluded that the appropriate equity cost rate was between 7.5% and 8.6%; however, he gave greater weight to the DCF model and recommended an authorized ROE of 8.5%.

On 21 December 2012, the Commission issued an order that authorized an increase of $21,954,000 in Dominion's gross annual revenues and approved an ROE of 10.2%. The Commission approved Dominion's treatment of Nucor in its cost-of-service study. The Commission determined that it was appropriate to reduce Nucor's peak demand to reflect the value of the interruptible nature of its contract with Dominion. However, the Commission did not accept the recommendations of Nucor's witness Goins. The Commission found that "[o]utside of the relatively few

hours the Company can contractually request Nucor to curtail its arc furnace load, Nucor is free to buy through all other requests at a fixed price arrangement." In addition, the Commission noted that "it is completely up to Nucor during these buy-through time periods to decide how much energy to consume and the resulting demand that it places on the system, and when to consume that energy." The Commission concluded that no additional adjustment should be made to the cost-of-service study to account for Nucor because "[t]o do otherwise would inappropriately shift costs to other customer classes and jurisdictions."

In support of its ROE determination, the Commission summarized the testimony of Hevert, Johnson, and Woolridge. The Commission noted that Hevert had updated his analysis during his rebuttal testimony by adding a company to the proxy group and adjusting the expected growth rates. The Commission found that given the small size of Hevert's proxy group, the update "inordinately influenced" his results. In weighing the testimony of Johnson and Woolridge, the Commission noted that their recommendations were "below any authorized ROE determination for a vertically-integrated electric utility like [Dominion] by any Commission in the last 30 years."

The Commission also acknowledged that it was required to consider whether the order was fair and reasonable to consumers, stating:

> [T]he Commission is required to consider the economic
> effects of its ROE decision on a public utility's customers

pursuant to G.S. 62-133(b)(4). In particular, G.S. 62-133(b)(4) states, in pertinent part, that in fixing rates the Commission must fix a rate of return on the utility's investment that "will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, including, but not limited to . . . to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors." One of the "terms" on which a public utility competes in the market for capital funds is the utility's authorized ROE. Thus, the Commission must consider whether that term is reasonable and fair to the utility's customers.

(ellipsis in original.) But the Commission cited only the following evidence regarding this factor:

Public Staff witness Johnson testified in depth concerning the economic downturn, including the unemployment rate. In addition, the Commission received testimony and written statements from numerous public witnesses concerning the impact of current economic conditions on [Dominion's] customers. Therefore, the Commission has ample evidence to consider in determining whether the various ROEs supported by the expert testimony strikes [sic] a fair balance between a reasonable rate of return for shareholders and reasonable rates for the Company's customers.

In addition, the Commission noted that "Hevert and . . . Johnson testified that it is not necessary to consider the impact of changing economic conditions on consumers in the context of an ROE economic analysis, other than in a broader macroeconomic sense, when analyzing changing market conditions for the purpose of making ROE recommendations."

The Commission determined that an ROE of 10.2% "strikes a fair balance between the interests of the Company, its shareholders and ratepayers based on the current financial market and economic conditions." The Commission explained that 10.2% fell within the range of Hevert's DCF and CAPM results and the comparable earnings method used by Johnson. Furthermore, the Commission noted that "interest rates and authorized returns have trended down since the Company's last general rate case order in December of 2010, when [Dominion] was allowed a rate of return on common equity of 10.70%." Nucor and the Attorney General appealed.

Subsection 62-79(a) of the North Carolina General Statutes "sets forth the standard for Commission orders against which they will be analyzed upon appeal." *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n ("CUCA I")*, 348 N.C. 452, 461, 500 S.E.2d 693, 700 (1998). Subsection 62-79(a) provides:

> (a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:
>
> (1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and
>
> (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (2013). When reviewing an order of the Commission, this Court

> may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the

Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

*Id.* § 62-94(b) (2013). Pursuant to subsection 62-94(b), this Court must determine whether the Commission's findings of fact are supported by competent, material, and substantial evidence in view of the entire record. *Id.*; *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 699 (citations omitted). "Substantial evidence [is] defined as more than a scintilla or a permissible inference. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 700 (alteration in original) (citations and quotation marks omitted). The Commission must include all necessary findings of fact, and failure to do so constitutes an error of law. *Id.*

In its appeal Nucor argues that the Commission "is prohibited from considering the potential impact of its decision on ratepayers in other jurisdictions

when determining the total amount of revenues required from North Carolina's retail ratepayers." As a result, Nucor contends that the Commission erred by finding that further adjustments to the cost-of-service study would "inappropriately shift costs to other . . . jurisdictions." In support of its assertion, Nucor notes that the Commission must consider costs associated with "providing the service rendered to the public within the State," N.C.G.S. § 62-133(b)(1) (2013), and fix a rate of return "in accordance with the reasonable requirements of its customers in the territory covered by its franchise," *id.* § 62-133(b)(4) (2013). In Nucor's view, this language establishing the Commission's role in North Carolina means that the Commission is prohibited from considering any effect, however harmful, that its order might have beyond North Carolina.

The express legislative mandate of section 62-133 is that the Commission "fix such rates as shall be fair both to the public utilities and to the consumer." N.C.G.S. § 62-133(a) (2013); *see also, e.g.*, *id.* § 62-131(a) (2013); *CUCA I*, 348 N.C. at 462, 500 S.E.2d at 701 (noting that the Commission must determine "a rate that is just and reasonable both to the utility company and to the public"). In its order the Commission explained in detail that Goins's recommendations were not fair to investors or other consumers. The Commission noted that the specific terms of Nucor's contract impose minimal service interruption on Nucor and permit use of electricity during a period of curtailment. The Commission noted that Dominion often "has no option other than to provide . . . energy whenever it is demanded." As

-13-

a result, the Commission found that Nucor's use of energy creates substantial costs for Dominion and concluded that those costs should be included in the cost-of-service study. The Commission's comment that Goins's recommendation "would inappropriately shift costs to other customer classes and jurisdictions" represents the Commission's determination that it would be unfair to make further adjustments to the cost-of-service study to account for Nucor's interruptible contract. We hold that this determination was not "[i]n excess of statutory authority or jurisdiction of the Commission." N.C.G.S. § 62-94(b)(2).

Next, Nucor argues that the Commission's findings rejecting Goins's recommendations regarding the cost-of-service study were not supported by competent, material, and substantial evidence. Nucor contends that the evidence shows that Goins's proposals would not have shifted costs to other customer classes or jurisdictions and would have produced a lower revenue requirement. Nonetheless, it is the role of the Commission, not the reviewing court, to weigh the evidence. *See Public Staff III*, 323 N.C. at 491, 374 S.E.2d at 367 (citation omitted). " 'The rate order of the Commission will be affirmed if . . . the facts found by the Commission are supported by competent, material and substantial evidence.' " *State ex rel. Utils. Comm'n v. Thornburg*, 325 N.C. 463, 476, 385 S.E.2d 451, 458 (1989) (citation omitted). The Commission rejected Goins's recommendations, and there was substantial evidence in the record, including the testimony of three other expert witnesses who strongly opposed Goins's recommendations, to support the

Commission's findings. As a result, Nucor's argument is meritless. Accordingly, we affirm that portion of the Commission's order concerning the treatment of Nucor in Dominion's cost-of-service studies.

In the second issue before us, the Attorney General argues that the Commission's order is legally deficient because the Commission failed to make required findings and conclusions regarding changing economic conditions and the resulting impact on consumers. In addition, the Attorney General contends that the Commission's order does not contain sufficient findings and reasoning regarding interest rate trends and the ROE range it referenced in reaching its decision. Furthermore, the Attorney General asserts that the Commission's order inappropriately considered ROEs authorized for other utilities by other commissions and the prior ROE authorized for Dominion, which do not reflect current economic conditions.

The Commission has a statutory obligation to treat both shareholders and consumers fairly. Subdivision 62-133(b)(4) of the North Carolina General Statutes requires the Commission to fix a rate of return that

> will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors . . . to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors.

N.C.G.S. § 62-133(b)(4). We have explained that this provision advances the Legislature's "twin goals of assuring sufficient shareholder investment in utilities while simultaneously maintaining the lowest possible cost to the using public for quality service." *CUCA I*, 348 N.C. at 458, 500 S.E.2d at 698.

Most recently, we stated that "customer interests cannot be measured only indirectly or treated as mere afterthoughts . . . . Instead, it is clear that the Commission must take customer interests into account when making an ROE determination." *Cooper*, 366 N.C. at 495, 739 S.E.2d at 548. In *Cooper* the Commission adopted the ROE stipulation of a nonunanimous settlement proposal. *See id.* at 486, 489, 739 S.E.2d at 542-44. We concluded that the order did not contain sufficient findings to demonstrate that the Commission had exercised its own independent judgment. *Id.* at 493, 739 S.E.2d at 547. In addition, we concluded that the Commission had not made sufficient findings regarding the impact of changing economic conditions on consumers. *Id.* at 494, 739 S.E.2d at 547.

The Commission did not have the benefit of our guidance in *Cooper* when it issued its order in the case *sub judice*. As a result, the findings of fact regarding this issue are virtually identical to the findings we held were deficient in *Cooper*:

| The Commission's Order in This Case | The Commission's Order in *Cooper* |
|---|---|
| [Dominion] witness Hevert and Public Staff witness Johnson testified that it is | Duke witness Hevert and Public Staff witness Johnson testified that it is not |

not necessary to consider the impact of changing economic conditions on consumers in the context of an ROE economic analysis, other than in a broader macroeconomic sense, when analyzing changing market conditions for the purpose of making ROE recommendations. However, the Commission is required to consider the economic effects of its ROE decision on a public utility's customers pursuant to G.S. 62-133(b)(4). In particular, G.S. 62-133(b)(4) states, in pertinent part, that in fixing rates the Commission must fix a rate of return on the utility's investment that "will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, including, but not limited to . . . to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors." One of the "terms" on which a public utility competes in the market for capital funds is the utility's authorized ROE. Thus, the Commission must consider whether that term is reasonable and fair to the utility's customers. Public Staff witness Johnson testified in depth concerning the economic downturn, including the unemployment rate. In addition, the Commission received testimony and written statements from numerous public witnesses concerning the impact of current economic conditions on [Dominion's] customers. Therefore, the Commission has ample evidence to consider in determining whether the

necessary to consider the impact of changing economic conditions on consumers in the context of an ROE economic analysis, other than in a broader macroeconomic sense, when analyzing changing market conditions for the purpose of making ROE recommendations. However, the Commission is required to consider the economic effects of its ROE decision on a public utility's customers pursuant to G.S. 62-133(b)(4). In particular, G.S. 62-133(b)(4) states, in pertinent part, that in fixing rates the Commission must fix a rate of return on the utility's investment that "will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, including, but not limited to . . . to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors." One of the "terms" on which a public utility competes in the market for capital funds is the utility's authorized ROE. Thus, the Commission must consider whether that term is reasonable and fair to the utility's customers. Public Staff witness Johnson testified in depth concerning the economic downturn, including the unemployment rate. In addition, the Commission received extensive testimony from public witnesses concerning the impact of current economic conditions on Duke's customers. Therefore, the Commission has ample evidence to consider in determining whether the proposed ROE

various ROEs supported by the expert testimony strikes [sic] a fair balance between a reasonable rate of return for shareholders and reasonable rates for the Company's customers. (ellipsis in original) (citation omitted).

of 10.5% is fair to Duke's customers. (ellipsis in original).

We recognize the appeal of using boilerplate findings of fact in cases that frequently may appear so similar, but this type of pro forma fact-finding is insufficient to meet the Commission's obligations pursuant to Chapter 62 of the General Statutes. We reiterate our concern with the Commission treating consumer interests as incidental to its statutory mandate or as a "mere afterthought[ ]." *Cooper*, 366 N.C. at 495, 739 S.E.2d at 548. Although the Commission's order mentions testimony by Johnson and the public witnesses, the order omits the substance of this evidence and, more importantly, the weight which it was given. This ROE determination fails to meet the statutory requirement that "the Commission must make findings of fact regarding the impact of changing economic conditions on customers when determining the proper ROE for a public utility." *Id.*

In addition, we note that the evidence offered by Johnson and Woolridge suggested that Dominion's cost of equity may have fallen substantially since its last general rate case order in December 2010. These experts recommended ROEs significantly below the 10.7% ROE last authorized by the Commission; however, the Commission gave little weight to their testimony because their recommendations

were "below any authorized ROE determination for a vertically-integrated electric utility like [Dominion] by any Commission in the last 30 years." The Commission then made an ROE determination within the higher range of Hevert's DCF and CAPM results, 10.5% to 11.5%, and Johnson's comparable earnings method, 9.75% to 10.75%.

We previously have stated that "[t]he Commission's concern about an 'extreme fluctuation' between the rate of return allowed in [the company's] last general rate case and that allowed here . . . is an improper consideration in determining rate of return. It has nothing to do with the [c]ompany's *existing* cost of equity." *State ex rel. Utils. Comm'n v. Public Staff*, 331 N.C. 215, 225, 415 S.E.2d 354, 361 (1992) (citing N.C.G.S. § 62-133(b)(4) (1989)). There does not appear to be any evidence in the record indicating that the economic conditions facing Dominion, its shareholders, and its consumers today are comparable to the conditions facing other utilities over the last thirty years. Fundamentally, the Commission's reliance on past ROE determinations authorized for other utilities, without evidence tying those determinations to the facts of the case *sub judice*, prevented the Commission from fairly considering current economic conditions.

For the foregoing reasons, we reverse and remand that portion of the order addressing the Commission's ROE determination with instructions to make

additional findings of fact concerning the impact of changing economic conditions on

consumers.  We affirm the remainder of the Commission's order.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.