IN THE SUPREME COURT OF NORTH CAROLINA

No. 12A14

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION, PUBLIC STAFF – NORTH CAROLINA UTILITIES COMMISSION, and DUKE ENERGY CAROLINAS, LLC

v.

ATTORNEY GENERAL ROY COOPER and NORTH CAROLINA WASTE AWARENESS AND REDUCTION NETWORK

Filed 23 January 2015

On direct appeal as of right pursuant to N.C.G.S. §§ 7A-29(b) and 62-90(d) from a final order of the North Carolina Utilities Commission entered on 24 September 2013 in Docket No. E-7, Sub 1026. Heard in the Supreme Court on 8 September 2014.

*Troutman Sanders LLP, by Kiran H. Mehta; Heather Shirley Smith, Deputy General Counsel, and Charles A. Castle, Associate General Counsel, Duke Energy Carolinas, LLC; and Williams Mullen, by Christopher G. Browning, Jr., for applicant-appellee Duke Energy Carolinas, LLC.*

*Antoinette R. Wike, Chief Counsel, and William E. Grantmyre, David T. Drooz, and Robert S. Gillam, Staff Attorneys, for intervenor-appellee Public Staff – North Carolina Utilities Commission.*

*Kevin Anderson, Senior Deputy Attorney General; Phillip K. Woods, Special Deputy Attorney General; Michael T. Henry, Assistant Attorney General; and John F. Maddrey, Solicitor General, for intervenor-appellant Roy Cooper, Attorney General.*

*Law Offices of F. Bryan Brice, Jr., by Matthew D. Quinn; and John D. Runkle for NC WARN, intervenor-appellant.*

JACKSON, Justice.

In this case we consider whether the order of the North Carolina Utilities Commission ("the Commission") authorizing a 10.2% return on equity ("ROE") for Duke Energy Carolinas ("Duke") contained sufficient findings of fact to demonstrate that the order was supported by competent, material, and substantial evidence in view of the entire record. *See* N.C.G.S. § 62-94 (2013). In addition, we consider whether the Commission's use of the single coincident peak ("1CP") cost-of-service methodology unreasonably discriminated against residential customers and whether the Commission inappropriately shifted certain expenses to ratepayers. Because we conclude that the Commission made sufficient findings of fact regarding the impact of changing economic conditions upon customers, that the use of 1CP was supported by substantial evidence, and that no improper costs were included in the Commission's order, we affirm.

On 4 February 2013, Duke filed an application with the Commission requesting authority to adjust and increase its North Carolina retail electric service rates to produce an additional $446,000,000, yielding a net increase of 9.7% in overall base revenues. The application requested that rates be established using an ROE of 11.25%. The ROE represents the return that a utility is allowed to earn on the equity-financed portion of its capital investment by charging rates to its customers. As a result, the ROE approved by the Commission affects profits for shareholders and costs to consumers. *State ex rel. Utils. Comm'n v. Cooper*, 367 N.C. 430, 432, 758 S.E.2d 635, 636 (2014) (citations omitted). "The ROE is one of

the components used in determining a company's overall rate of return." *Id.* (citation omitted).

On 4 March 2013, the Commission entered an order declaring this proceeding a general rate case and suspending the proposed new rates for up to 270 days. The Commission scheduled five hearings across the state to receive public witness testimony. The Commission also scheduled an evidentiary hearing for 8 July 2013 to receive expert witness testimony. The Attorney General of North Carolina and the Public Staff of the Commission intervened as allowed by law. *See* N.C.G.S. §§ 62-15, -20 (2013). In addition, several parties filed petitions to intervene, including the North Carolina Waste Awareness and Reduction Network ("NC WARN").

On 17 June 2013, Duke and the Public Staff filed an Agreement and Stipulation of Settlement with the Commission. The Stipulation produced a net increase of $234,480,000 in annual revenues and an ROE of 10.2%. The Stipulation provided for the use of the 1CP cost-of-service methodology. Among the parties contesting the Stipulation were the Attorney General and NC WARN.

During the hearings, the Commission received testimony from 131 public witnesses, and the parties presented both expert testimony and documentary evidence. The evidence presented before the Commission will be discussed in greater detail as necessary throughout this opinion.

On 24 September 2013, the Commission entered an order granting a $234,480,000 annual retail revenue increase, approving an ROE of 10.2%, and authorizing the use of the 1CP cost-of-service methodology as agreed to in the Stipulation. The Commission reviewed the evidence before it and stated that it must consider whether the ROE is reasonable and fair to customers. *See State ex rel. Utils. Comm'n v. Cooper* ("*Cooper I*"), 366 N.C. 484, 493, 739 S.E.2d 541, 547 (2013). The Commission concluded that the rate increase, ROE, and cost-of-service methodology set forth in the Stipulation were "just and reasonable to the Company's customers and to all parties of record in light of all the evidence presented." The Attorney General and NC WARN appealed the Commission's order to this Court as of right pursuant to N.C.G.S. §§ 7A-29(b) and 62-90.

Subsection 62-79(a) of the North Carolina General Statutes "sets forth the standard for Commission orders against which they will be analyzed upon appeal." *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n* ("*CUCA I*"), 348 N.C. 452, 461, 500 S.E.2d 693, 700 (1998). Subsection 62-79(a) provides:

> (a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:
>
> (1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and
>
> (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (2013). When reviewing an order of the Commission, this Court may, *inter alia*,

> reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional provisions, or
>
> (2) In excess of statutory authority or jurisdiction of the Commission, or
>
> (3) Made upon unlawful proceedings, or
>
> (4) Affected by other errors of law, or
>
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
>
> (6) Arbitrary or capricious.

*Id.* § 62-94(b). Pursuant to subsection 62-94(b) this Court must determine whether the Commission's findings of fact are supported by competent, material, and substantial evidence in view of the entire record. *Id.*; *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 699 (citation omitted). "Substantial evidence [is] defined as more than a scintilla or a permissible inference. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 700 (alteration in original) (citations and quotation

marks omitted).  The Commission must include all necessary findings of fact, and failure to do so constitutes an error of law.  *Id.* (citation omitted).

The Attorney General argues that the Commission's order is legally deficient because it is not supported by competent, material, and substantial evidence and does not include sufficient findings, reasoning, and conclusions.  Specifically, the Attorney General contends that the Commission failed to make findings of fact showing in "meaningful detail" how it "quantified" the impact of changing economic conditions upon customers when determining the proper ROE.  We disagree.

Pursuant to subdivision 62-133(b)(4) of the North Carolina General Statutes, the Commission must fix a rate of return that

> will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, . . . to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors.

N.C.G.S. § 62-133(b)(4) (2013).  In *Cooper I* we observed that this provision, along with Chapter 62 as a whole, requires the Commission to treat consumer interests fairly—not indirectly or as "mere afterthoughts."  366 N.C. at 495, 739 S.E.2d at 548.  But although the Commission must make findings of fact with respect to the impact of changing economic conditions upon consumers, "we did not state in *Cooper I* that the Commission must 'quantify' the influence of this factor upon the

final ROE determination." *State ex rel. Utils. Comm'n v. Cooper*, 367 N.C. 444, 450, 761 S.E.2d 640, 644 (2014) (citations omitted).

The evidence before the Commission included expert testimony and documentary evidence concerning ROE. Duke presented the testimony of Robert B. Hevert, Managing Partner of Sussex Economic Advisers, LLC. Hevert testified in support of the 10.2% ROE agreed to in the Stipulation. Although Hevert originally had recommended an ROE of 11.25%, he testified that he respected Duke's determination that an ROE of 10.2% would be sufficient to raise necessary capital. Hevert also discussed the effect of capital market conditions upon Duke's North Carolina customers. He testified that although North Carolina's unemployment rate was higher than the national average, the State's GDP growth and expected household income growth exceeded the national average. Hevert noted that North Carolina's average residential electric rates were approximately 12.46% below the national average. Hevert testified that his ROE analysis reflected changing economic conditions.

The Public Staff presented the testimony of Ben Johnson, Consulting Economist and President of Ben Johnson Associates, Inc. Johnson also supported the 10.2% ROE agreed to in the Stipulation. He explained that he had computed an ROE range of 9.75% to 10.75% using the comparable earnings method and that an ROE of 10.2% would fall just below the midpoint of that range. Johnson testified

that he took into consideration changing economic conditions and determined that the Stipulation is "responsive" to those "difficult economic conditions."

The Commercial Group—representing some of Duke's commercial energy customers—presented the testimony of Steve Chriss, Senior Manager for Energy Regulatory Analysis for Wal-Mart Stores, Inc., and Wayne Rosa, Energy and Maintenance Manager for Food Lion, LLC. Chriss and Rosa did not recommend a specific ROE, but noted that Hevert's original recommendation of 11.25% exceeded the range of recently authorized ROEs across the country. They testified that the 10.2% ROE contained in the Stipulation "provides for significant movement on the Commercial Group's concerns regarding rate of return on equity."

Finally, the Attorney General introduced documentary evidence intended to show that setting a lower ROE results in lower rates and a report comparing average utility bills and average disposable income on a state-by-state basis.

The Commission stated that it gave "substantial weight" to Hevert's testimony that, although North Carolina's unemployment rate was higher than the national average, the State enjoyed lower average electric rates, higher expected household income growth, and superior GDP growth as compared with the nation as a whole. Similarly, the Commission stated that it gave "substantial weight" to Johnson's testimony that the recent financial crisis had resulted in a period of "prolonged weakness." The Commission noted that both Hevert and Johnson

testified that economic conditions facing customers have improved since the financial crisis. Furthermore, the Commission found that sixty-eight of the public witnesses who testified at the hearings stated that "the rate increase was not affordable to many customers," including the elderly, the unemployed and underemployed, the poor, and persons with disabilities. Nevertheless, the Commission explained that

> nine public witnesses testified that they understood [Duke's] need to increase rates in an effort to retire older coal plants and replace them with natural gas generation. In addition, 22 public witnesses expressed the view that the Company should be required to discontinue its fossil fuel and nuclear generation in favor of energy efficiency and renewable resources.

The Commission found that the Stipulation "result[ed] in lower rates to consumers in the existing economic environment and provides consumers with greater rate stability." The Commission noted that the Stipulation provided for a phase-in of the rate increase in which $30 million of the total annual revenue increase would be deferred for two years. The Commission acknowledged that this provision only mitigated the rate increase temporarily, but found that it would "help ratepayers at a time when the impact of economic conditions is relatively severe." In addition, the Commission noted that in the Stipulation, Duke agreed not to seek another increase in base rates for two years. The Commission found that this provision has "particular value to customers" because it would provide rate stability during a period in which Duke is planning to make large capital investments.

Finally, the Commission explained that the Stipulation requires Duke to contribute

$10 million for energy assistance for low-income customers.

Ultimately, the Commission found:

> 16.     Changing economic conditions in North Carolina during the last several years have caused high levels of unemployment, home foreclosures and other economic stress on [Duke's] customers.

> 17.   The rate increase approved in this case, which includes the approved return on equity and capital structure, will be difficult for some of [Duke's] customers to pay, in particular [Duke's] low-income customers.

> 18.   Continuous safe, adequate and reliable electric service by [Duke] is essential to the support of businesses, jobs, hospitals, government services, and the maintenance of a healthy environment.

> 19.     The return on equity and capital structure approved by the Commission appropriately balances the benefits received by [Duke's] customers from [Duke's] provision of safe, adequate and reliable electric service in support of businesses, jobs, hospitals, government services, and the maintenance of a healthy environment with the difficulties that some of [Duke's] customers will experience in paying [Duke's] increased rates.

> 20.   The 10.2% return on equity and the 53% equity financing approved by the Commission in this case result in a cost of capital that is as low as reasonably possible. They appropriately balance [Duke's] need to obtain equity financing and maintain a strong credit rating with its customers' need to pay the lowest possible rates.

> 21.     The difficulties that [Duke's] low-income customers will experience in paying [Duke's] increased rates will be mitigated to some extent by the $10 million

of shareholder funds that [Duke] will contribute to assist
low-income customers.

These findings of fact not only demonstrate that the Commission considered the impact of changing economic conditions upon customers, but also specify how this factor influenced the Commission's decision to authorize a 10.2% ROE as agreed to in the Stipulation. These findings are supported by the evidence before the Commission, including public witness testimony, expert testimony, and the Stipulation itself. Therefore, we hold that the Commission made sufficient findings regarding the impact of changing economic conditions upon customers and that these findings are supported by competent, material, and substantial evidence in view of the entire record.

In the second issue before us, NC WARN argues that the Commission's order authorized preferential treatment of the industrial class to the detriment of the residential class. NC WARN observes that the Commission approved use of the 1CP cost-of-service methodology for allocating costs and contends that this methodology results in a greater rate increase for the residential class. NC WARN asserts that this use of 1CP is unjustified and constitutes unreasonable discrimination. We disagree.

Section 62-140 prohibits unreasonable or unjust discrimination among customer classes. *CUCA I*, 348 N.C. at 467, 500 S.E.2d at 704 (citation omitted). The statute states in pertinent part:

> No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service.

N.C.G.S. § 62-140(a) (2013). "The charging of different rates for services rendered does not *per se* violate this statute." *CUCA I*, 348 N.C. at 468, 500 S.E.2d at 704 (citation omitted). But any differences in rates between customer classes "must be based on reasonable differences in conditions," including such factors as quantity of use, time of use, manner of service, and costs of rendering the various services. *Id.* (citation omitted).

The witnesses who testified before the Commission disagreed whether 1CP is a fair cost-of-service methodology. Phillip O. Stillman, Director of Regulatory Strategy and Research for Duke Energy Business Services, LLC, supported the use of 1CP. Stillman explained that 1CP allocates costs based upon how much demand each customer class placed upon the system during the single hour in the test year when total demand peaked. Stillman testified that Duke's historical load profile reflects a predominant summer peak and that using 1CP would allocate costs correctly in light of the actual load characteristics of Duke's system. Similarly, Kroger presented the testimony of Kevin C. Higgins, Principal of Energy Strategies, LLC, who explained that a utility's resource planning is driven by its need to meet its summer peak. In addition, Nicholas Phillips, Jr., Managing Principal of

Brubaker & Associates, Inc., testified that use of the 1CP methodology would allocate cost responsibility to customer classes properly and would minimize Duke's need for new generating capacity.

In contrast, NC WARN presented the testimony of William B. Marcus, Principal Economist for JBS Energy, Inc., who opposed the use of 1CP in this case. Marcus testified that costs arise not only from Duke's need to meet its peak demand, but from factors that are related to the amount of energy produced over the entire year, such as expenses for fuel handling, ash disposal, fuel transport, and water and consumable chemicals. Based upon these other costs, Marcus stated that 1CP may allocate costs unfairly and allow industrial customers to pay less than other customer classes. Michael R. Johnson, Senior Analyst in Greenpeace's Climate and Energy Campaign, also opposed using 1CP and asserted that this methodology contributes to environmental harm by encouraging the use of high emissions energy sources. Both witnesses recommended including a component in the cost-of-service methodology that accounts for the total energy consumed by each customer class.

The Commission stated that it gave "substantial weight" to Stillman's "undisputed testimony" that having sufficient generation and transmission resources to meet its summer peak load requirements "is an essential planning criterion of [Duke's] system." The Commission found that the use of 1CP would

allow all customer classes to share equitably in fixed costs relative to the demands they place on the system during the summer peak. But the Commission explained that the alternative methodologies recommended by NC WARN and Greenpeace were not supported by substantial evidence and had not been "adequately applied and analyzed with regard to the operating characteristics of the Company's system." As a result, the Commission concluded that their experts' testimony was entitled to "little weight."

Ultimately, the record contained conflicting evidence regarding whether the use of 1CP was reasonable and fair to Duke's different customers. The Commission considered all the evidence presented by the parties, explained the weight given to the evidence, and concluded that the use of 1CP methodology here was "just and reasonable" in light of the specific characteristics of Duke's system. We are mindful that "[i]t is not the function of this Court to determine whether there is evidence to support a position the Commission did not adopt. . . . The credibility of the testimony and the weight to be accorded it are for the Commission," rather than the reviewing court, "to decide." *State ex rel. Utils. Comm'n v. Piedmont Natural Gas Co.*, 346 N.C. 558, 569, 488 S.E.2d 591, 598 (1997) (citations omitted). We hold that there is substantial evidence in the record to support the Commission's finding that the use of 1CP allocates costs "equitably." NC WARN has not shown that the use of 1CP here results in unreasonable or unjust discrimination.

Finally, NC WARN argues that certain costs included in the Stipulation are not reasonable operating expenses and should not be recovered from ratepayers. We disagree.

In fixing rates the Commission must ascertain a utility's reasonable operating expenses. N.C.G.S. § 62-133(b)(3), (5) (2013). The Commission must fix rates that will allow the utility to recover its reasonable operating expenses and receive a fair rate of return on the cost of the property used and useful in providing the service rendered to the public. *Id.* § 62-133(b)(5); *see also State ex rel. Utils. Comm'n v. Thornburg*, 325 N.C. 463, 467 n.2, 385 S.E.2d 451, 453 n.2 (1989). "The findings of the Commission, when supported by competent evidence, are conclusive." *State ex rel. Utils. Comm'n v. N.C. Power*, 338 N.C. 412, 422, 450 S.E.2d 896, 901-02 (1994) (citation omitted), *cert. denied*, 516 U.S. 1092, 116 S. Ct. 813, 133 L. Ed. 2d 758 (1996).

Before the Commission Marcus testified that Duke should not be allowed to recover costs associated with stock-based compensation, advertising, dues, donations, political contributions, sponsorships, survey research, and liability insurance for directors and officers. In response to his concerns, Duke presented witnesses Carol E. Shrum, Director of Rates and Regulatory Strategy for Duke; Paul R. Newton, State President for Duke; and J. Danny Wiles, Director for Regulated Accounting for Duke Energy Corporation. Shrum disagreed with Marcus

about advertising, some of the disputed dues, survey research, and liability insurance for directors and officers, and testified that these costs constitute reasonable operating expenses. Similarly, Newton testified that stock-based compensation is a proper and reasonable expense that is allowable in setting rates.

Nevertheless, Shrum testified that the sponsorships, political contributions, donations, and some additional dues challenged by Marcus had been removed from Duke's cost of service in the Stipulation and would not be recovered from Duke's North Carolina customers. Both Newton and Wiles acknowledged that some of these expenses were not reasonable operating expenses and had been included because of errors by Duke. Wiles explained that "over 95%" of these errors already had been identified by the Public Staff and removed from the Stipulation. With respect to the remaining errors, Newton testified that they subsequently were corrected. Similarly, Katherine A. Fernald, Assistant Director in the Accounting Division of the Public Staff, testified that no unlawful expenses remained in the Stipulation.

In its order the Commission summarized the evidence concerning each expense that Marcus alleged was improper. The Commission concluded that some of these expenses were reasonable and could be recovered from ratepayers. But the Commission was "quite disturbed" to find that political contributions, which may not be recovered from ratepayers, were included in Duke's original application. The

Commission ordered Duke "to conduct an internal root cause analysis" of this error and to file a report by 31 December 2013. Nevertheless, based upon the evidence in the record, the Commission concluded that "all inappropriately coded charges" had been removed from the cost of service during the course of the proceeding. The Commission found that "any charges remaining outside of those reconciled in the Stipulation were subsequently addressed by the Company through additional adjustments, or appropriately accounted for by the Company's accounting system." We conclude that the Commission's findings are supported by substantial evidence in the record, including the testimony of witnesses for both Duke and the Public Staff acknowledging that errors occurred and explaining that corrective steps were taken to resolve the errors. NC WARN has not shown that the Commission allowed Duke to recover any improper costs from ratepayers.

Accordingly, the order of the Commission is affirmed.

AFFIRMED.

Justice ERVIN did not participate in the consideration or decision of this case.