IN THE SUPREME COURT OF NORTH CAROLINA

No. 268A12

FILED 12 APRIL 2013

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; DUKE ENERGY CAROLINAS, LLC, Applicant; PUBLIC STAFF-NORTH CAROLINA UTILITIES COMMISSION, Intervenor

v.

ATTORNEY GENERAL ROY COOPER and THE CITY OF DURHAM, NORTH CAROLINA, Intervenors

On direct appeal as of right by intervenor Roy Cooper, Attorney General, pursuant to N.C.G.S. §§ 7A-29(b) and 62-90(d) from a final order of the North Carolina Utilities Commission issued on 27 January 2012 in Docket No. E-7, Sub 989. Heard in the Supreme Court on 13 November 2012.

*K&L Gates LLP, by Kiran H. Mehta; Heather Shirley Smith, Deputy General Counsel, and Kendrick Fentress, Associate General Counsel, Duke Energy Carolinas, LLC; and Law Office of Robert W. Kaylor, by Robert W. Kaylor, for applicant-appellee Duke Energy Carolinas, LLC.*

*Robert P. Gruber, Executive Director, by Antoinette R. Wike, Chief Counsel, and William E. Grantmyre, Staff Attorney, for intervenor-appellee Public Staff-North Carolina Utilities Commission.*

*John F. Maddrey, Solicitor General; Phillip K. Woods, Special Deputy Attorney General; Margaret A. Force, Assistant Attorney General; and Kevin Anderson, Senior Deputy Attorney General, for intervenor-appellant Roy Cooper, Attorney General.*

*AARP Foundation Litigation, by Julie Nepveu, pro hac vice; and M. Jason Williams, P.A., by M. Jason Williams, for AARP, amicus curiae.*

JACKSON, Justice.

In this case we consider whether the order by the North Carolina Utilities Commission ("the Commission") approving a 10.5% return on equity[1] ("ROE") for Duke Energy Carolinas, LLC ("Duke") contained sufficient findings of fact to demonstrate that it was supported by competent, material, and substantial evidence in view of the entire record. Because we conclude that the Commission failed to make the necessary findings of fact to support its ROE determination, we reverse the Commission's order and remand this case to the Commission so that it may enter sufficient findings of fact.

On 1 July 2011, Duke filed an application with the Commission requesting authority to increase its North Carolina retail electric service rates to produce additional annual revenues of $646,057,000, an increase of approximately 15.2% over then current revenues. The application requested that rates be established using an ROE of 11.5%. The Commission entered an order on 28 July 2011, declaring this matter to be a general rate case and suspending the proposed rate increase pending further investigation. The Commission scheduled six public hearings to receive public witness testimony in multiple locations throughout Duke's service territory. The Commission also scheduled an evidentiary hearing for

---

[1] ROE is the return that a utility is allowed to earn on its capital investment, which is realized through rates collected from its customers. The ROE affects profits to the utility's shareholders and has a significant impact on what customers ultimately pay the utility. The higher the ROE, the higher the resulting rates that customers will pay to the utility. *See State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n*, 323 N.C. 238, 245, 372 S.E.2d 692, 696 (1988).

29 November 2011. The Attorney General of North Carolina and the Public Staff–North Carolina Utilities Commission intervened in this matter as allowed by law.

On 28 November 2011, the Public Staff and Duke filed an Agreement and Stipulation of Settlement with the Commission that "provide[d] for a net increase of $309,033,000" for annual revenues and an allowed "ROE of 10.5%." The Settlement addressed all issues between Duke and the Public Staff, but was contested by some of the other parties, including the Attorney General.

By the time the evidentiary hearing began on 29 November 2011, the Commission already had heard testimony from a total of 236 public witnesses. Many of these customers opposed the proposed rate increase and discussed the hardship that it would impose on the average residential customer in light of current economic conditions. At the evidentiary hearing the Commission heard more live testimony and also received prefiled testimony regarding the proposed ROE.

Specifically, Duke presented the testimony of Robert Hevert, President of Concentric Energy Advisors, Inc., a company that provides financial and economic advisory services to energy and utility clients across North America. Hevert initially recommended an ROE range of 11% to 11.75% and a specific ROE of 11.5%; however, in his rebuttal testimony Hevert lowered his recommended range to 10.75% to 11.5% and decreased his recommended ROE to 11.25%. Hevert testified

that his analysis was based upon market data and the ROE requirements of investors. In particular, Hevert stated that he factored into his analysis the effect of macroeconomic conditions in the capital markets. Hevert's analysis primarily used discounted cash flow[2] ("DCF") modeling, but also factored Duke-specific risks into the equation to produce a final recommended range and particular ROE. Hevert verified that when determining a reasonable ROE, he did not specifically consider factors such as the unemployment or poverty rates in Duke's service area, the impact of his recommendation on the company's fixed income customers or on cities and counties as ratepayers, or its effect on job creation in the region. Hevert further stated that although he reviewed "other witnesses testimony," he did not review any correspondence, petitions, or comments filed by customers. Hevert also testified that he was unfamiliar with the specific statutory requirements for establishing a fair and reasonable ROE in North Carolina and did not know whether the Commission was required to consider the effect of economic conditions on consumers when setting an ROE.

The Public Staff presented the testimony of Ben Johnson, Ph.D., President of Ben Johnson Associates, Inc., a consulting firm that specializes in public utility regulation. Johnson recommended an ROE range of 8.68% to 9.79% and a specific

---

[2] DCF modeling is an econometric method for estimating ROE whereby "the proper rate of return is determined by adding to the common stock's current yield a rate of increase which investors will expect to occur over time." *State ex rel. Utils. Comm'n v. Pub. Staff-N.C. Utils. Comm'n*, 322 N.C. 689, 693-94, 370 S.E.2d 567, 570 (1988).

ROE of 9.25%. Johnson based his ROE analysis upon two approaches. First, Johnson followed the comparable earnings approach, which "estimate[s] the long-run cost of equity as being equivalent to the level of returns being earned, on average, by firms throughout the economy" and then adjusts for risk differences between such firms. Second, Johnson followed a market analysis approach, which included a DCF analysis along with other econometric analyses. Johnson's testimony focused on the potential effect of a rate increase on Duke's investors and did not include any analysis of economic conditions in Duke's service area and their impact on customers. Although Johnson included an overview of general economic trends in his prefiled direct testimony, Johnson explained that his calculations did not consider the economic impact on Duke's customers when he determined ROE, adding that such considerations are "beyond the scope of [his] work" and are within the purview of other participants in the process. Johnson stated that "[t]he focus of [his] testimony was more on how investors are dealing with economic conditions and less so on how customers are dealing with those same economic conditions." Johnson elaborated that he "was not doing a specific calculation of whether, say, a five percent rate increase is more acceptable than seven and what the impact might be." Nonetheless, Johnson agreed that the impact of economic conditions on customers is an appropriate analysis that should be undertaken by the Commission.

The Carolina Utility Customers Association, Inc. ("CUCA"), a coalition of industrial energy customers, presented the testimony of Kevin O'Donnell, President

of Nova Energy Consultants, Inc., who recommended a specific ROE of 9.5%. O'Donnell recommended an ROE range of 8.75% to 9.75% based upon a DCF analysis and an ROE range of 8.5% to 9.5% based upon the comparable earnings approach. O'Donnell's testimony contained no analysis of economic conditions in Duke's service area and their impact on customers.

The Commercial Group, an ad hoc group of Duke's commercial energy customers, presented the testimony of Steve Chriss, Senior Manager for Energy Regulatory Analysis for Wal-Mart Stores, Inc., and Wayne Rosa, Energy and Maintenance Manager for Food Lion, LLC. Chriss and Rosa declined to recommend an ROE range or specific ROE, but did testify that the 11.5% ROE that Duke initially requested exceeded both Duke's currently authorized return and recently authorized returns across the country which averaged 10.32%. Chriss and Rosa did testify that rate increases directly affect retailers and their customers and that a rate increase "is a serious concern" given current economic conditions. Chriss and Rosa did not discuss the fairness of the proposed ROE given the impact of changing economic conditions on customers, but requested that the Commission "consider these impacts thoroughly and carefully in ensuring that any increase in [Duke's] rates is only the minimum amount necessary."

The Attorney General did not present any ROE evidence.

On 27 January 2012, the Commission issued an order, granting a $309,033,000 annual retail revenue increase for Duke and approving an ROE of 10.5%—the same revenue increase and ROE agreed to in the Stipulation. In support of these conclusions, the Commission summarized—but did not weigh—the testimony of Hevert, Johnson, O'Donnell, and Chriss. The Commission also acknowledged that it was required to consider whether the ROE is reasonable and fair to customers, stating:

> [T]he Commission is required to consider the economic effects of its ROE decision on a public utility's customers pursuant to G.S. 62-133(b)(4). In particular, G.S. 62-133(b)(4) states, in pertinent part, that in fixing rates the Commission must fix a rate of return on the utility's investment that "will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, including, but not limited to...to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors." One of the "terms" on which a public utility competes in the market for capital funds is the utility's authorized ROE. Thus, the Commission must consider whether that term is reasonable and fair to the utility's customers.

But the Commission cited only the following evidence regarding this factor:

> Public Staff witness Johnson testified in depth concerning the economic downturn, including the unemployment rate. In addition, the Commission received extensive testimony from public witnesses concerning the impact of current economic conditions on Duke's customers. Therefore, the Commission has ample evidence to consider in determining whether the proposed ROE of 10.5% is fair to Duke's customers.

Ultimately, the Commission concluded that the 10.5% ROE set forth in the

Stipulation is "just and reasonable to all parties in light of all the evidence presented." The Commission noted that, while an ROE of 10.5% had not specifically been recommended by any particular expert witness, it fell within the "range" between the Public Staff's initial position of 9.25% and Duke's requested ROE of 11.25%. The Commission further noted that the 10.5% ROE was within the range of ROEs recommended by the witnesses. The Attorney General appealed the Commission's order to this Court as of right pursuant to subsection 7A-29(b) of the North Carolina General Statutes.

Subsection 62-79(a) of the North Carolina General Statutes "sets forth the standard for Commission orders against which they will be analyzed upon appeal." *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n (CUCA I)*, 348 N.C. 452, 461, 500 S.E.2d 693, 700 (1998). Subsection 62-79(a) provides:

> (a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:
> (1) Findings and conclusions and the reasons for bases therefor upon all the material issues of fact, law, or discretion presented in the record, and
> (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (2011). "The purpose of the required detail as to findings, conclusions and reasons as mandated by this subsection is to provide the appellate court with sufficient information with which to determine under the scope of review the questions at issue in the proceedings." *CUCA I*, 348 N.C. at 461, 500 S.E.2d at

700.

This Court previously has recognized that "[t]he decision of the Commission will be upheld on appeal unless it is assailable on one of the statutory grounds enumerated in [N.C.G.S. §] 62-94(b)." *Id.* at 459, 500 S.E.2d at 699 (citation omitted). Subsection 62-94(b) provides:

> (b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional provisions, or
> (2) In excess of statutory authority or jurisdiction of the Commission, or
> (3) Made upon unlawful proceedings, or
> (4) Affected by other errors of law, or
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
> (6) Arbitrary or capricious.

N.C.G.S. § 62-94(b) (2011). This Court has summarized its role pursuant to subsection 62-94(b) as follows:

> This Court's role under section 62-94(b) is not to determine whether there is evidence to support a position the Commission did not adopt. Instead, the test upon appeal is whether the Commission's findings of fact are supported by competent, material and substantial evidence in view of the entire record. Substantial

> evidence [is] defined as more than a scintilla or a
> permissible inference. It means such relevant evidence as
> a reasonable mind might accept as adequate to support a
> conclusion. The Commission's knowledge, however
> expert, cannot be considered by this Court unless the facts
> and findings thereof embraced within that knowledge are
> in the record. Failure to include all necessary findings of
> fact is an error of law and a basis for remand under
> section 62-94(b)(4) because it frustrates appellate review.

*CUCA I*, 348 N.C. at 460, 500 S.E.2d at 699-700 (alteration in original) (citations

and internal quotation marks omitted).

In the case *sub judice* the Attorney General argues that the Commission's

order was legally deficient because it was not supported by competent, material,

and substantial evidence, and did not include sufficient conclusions and reasoning.

Specifically, the Attorney General contends that by merely adopting the ROE

contained in the nonunanimous Stipulation, the Commission failed to undertake an

independent analysis and reach its own conclusion regarding the ROE. In addition,

the Attorney General contends that the Commission failed to consider changing

economic conditions and their impact on consumers in determining the ROE.

"What constitutes a fair rate of return on common equity is a conclusion of

law that must be predicated on adequate factual findings." *Id.* at 462, 500 S.E.2d at

701. This Court previously has set forth the procedure that the Commission must

follow when making an ROE determination:

> In finding essential, ultimate facts, the Commission must
> consider and make its determination based upon all

> factors particularized in section 62-133, including "all other material facts of record" that will enable the Commission to determine what are reasonable and just rates. The Commission must then arrive at its *"own independent conclusion"* as to the fair value of the applicant's investment, the rate base, and what rate of return on the rate base will constitute a rate that is just and reasonable both to the utility company and to the public.

*Id.* In reaching this conclusion, the Commission may consider partial, as well as unanimous stipulations. "[A] stipulation entered into by less than all of the parties as to any facts or issues in a contested case proceeding under chapter 62 should be accorded full consideration and weighed by the Commission with all other evidence presented by any of the parties in the proceeding." *Id.* at 466, 500 S.E.2d at 703. Specifically,

> [t]he Commission must consider the nonunanimous stipulation along with all the evidence presented and any other facts the Commission finds relevant to the fair and just determination of the proceeding. The Commission may even adopt the recommendations or provisions of the nonunanimous stipulation as long as the Commission sets forth its reasoning and makes "its own independent conclusion" supported by substantial evidence on the record that the proposal is just and reasonable to all parties in light of all the evidence presented.

*Id.* Nonetheless, "only those stipulations that are entered into by all of the parties before the Commission may form the basis of informal disposition of a contested proceeding under section 62-69(a), *id.*, and such is not the case here.

Two cases previously decided by this Court provide useful guidance on the

application of these principles. In *CUCA I* this Court concluded that "the Commission failed to adduce 'its own independent conclusion' as to the appropriate rate of return on equity." *Id.* at 467, 500 S.E.2d at 703. In its order, the Commission approved the same ROE that was contained in a nonunanimous stipulation without weighing all the available testimony. *Id.* This Court noted that:

> The stipulated 11.4% rate should have been considered and analyzed by the Commission along with all the evidence regarding proper rate of return, including the testimony of Mr. O'Donnell on behalf of CUCA that 10.55% was the appropriate return on equity. The only other evidence supporting the 11.4% rate was the rebuttal testimony of Mr. Lurie in defense of the stipulation that the stipulated rate was "just and reasonable."

*Id.* at 466-67, 500 S.E.2d at 703. This Court then determined that "[i]n light of the facts that Mr. Lurie's initial recommendation was 13.34% and that no other evidence supported the 11.4% rate, it is clear that the Commission adopted wholesale, without analysis or deduction, the 11.4% rate from the partial stipulation, as opposed to considering it as one piece of evidence to be weighed in making an otherwise independent determination." *Id.* at 467, 500 S.E.2d at 703.

In contrast, two years later this Court concluded that the Utilities Commission "adduced its own independent conclusion as to the appropriate rate of return on equity" and held that "this conclusion [was] fully supported by substantial evidence in view of the entire record." *State ex rel. Utils. Comm'n v. Carolina Util.*

*Customers Ass'n* (*CUCA II*), 351 N.C. 223, 235, 524 S.E.2d 10, 19 (2000). This Court noted that "[a] thorough review of the record . . . reveal[ed] that the Commission's 11.4% rate of return on common equity conclusion c[ame] from the direct testimony and exhibits of Public Staff witness Hinton." *Id.* at 233, 524 S.E.2d at 17. This Court then determined that the Commission "independently analyz[ed] the testimony of [the applicant company's] witness Andrews, CUCA witness O'Donnell, and Public Staff witness Hinton before reaching its conclusion that 11.4% was the appropriate cost of common equity." *Id.* Specifically, this Court noted that "the Commission accepted Public Staff witness Hinton's recommendation of 11.4% based on the credibility and objectivity of his PSNC-specific DCF analysis" "[a]fter *weighing* the conflicting evidence of the expert witnesses." *Id.* at 235, 524 S.E.2d at 19 (emphasis added).

Here although the 10.5% ROE contained in the nonunanimous Stipulation fell within the range of ROEs recommended by the witnesses at the evidentiary hearing, in contrast to *CUCA II*, none of the witnesses specifically recommended an ROE of 10.5% based upon their calculations. Johnson did testify that the stipulated ROE "was not unreasonable"; however, he also recommended a different ROE of 9.25%. In addition, in contrast to *CUCA II*, it does not appear that the Commission weighed any of the testimony presented at the evidentiary hearing. Instead, it appears that the Commission merely recited the witnesses' testimony before reaching an ROE conclusion in its order. Notably absent from the Commission's

order is any discussion of why one witness's testimony was more credible than another's or which methodology was afforded the greatest weight. *See CUCA II*, 351 N.C. at 233-35, 524 S.E.2d at 17-19.

Without sufficient findings of fact as to these issues, we cannot say that the Commission "ma[de] 'its own independent conclusion' . . . that the propos[ed] [ROE] [wa]s just and reasonable to all parties in light of all the evidence presented." *CUCA I*, 348 N.C. at 466, 500 S.E.2d at 703. Instead, it appears that "the Commission adopted wholesale, without analysis or deduction," the 10.5% stipulated ROE, "as opposed to considering it as one piece of evidence to be weighed in making an otherwise independent determination." *Id.* at 467, 500 S.E.2d at 703. Accordingly, the Commission's order must be reversed and this case remanded to the Commission so that it can make an independent determination regarding the proper ROE based upon appropriate findings of fact that balance all the available evidence.

As guidance on remand, we further note that in making its ROE determination the Commission failed to make findings of fact regarding the impact of changing economic conditions on customers. "In fixing the rates to be charged by a public utility for its service, the Commission must . . . comply with the requirements of [Chapter 62 of the North Carolina General Statutes], *more specifically, [N.C.]G.S. [§] 62-133.*" *Id.* at 457, 500 S.E.2d at 698 (quotation marks

omitted).  Section 62-133 states that the Commission must, *inter alia*:

> (4) Fix such rate of return on the cost of the property ascertained pursuant to subdivision (1) of this subsection as will enable the public utility by sound management to produce a fair return for its shareholders, considering *changing economic conditions* and other factors, including, but not limited to, the inclusion of construction work in progress in the utility's property under sub-subdivision b. of subdivision (1) of this subsection, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms that are reasonable and that are *fair to its customers* and to its existing investors.

N.C.G.S. § 62-133(b)(4) (2011) (emphases added).  "In finding essential, ultimate facts, the Commission must consider and make its determination based upon *all factors* particularized in section 62-133, including 'all other material facts of record' that will enable the Commission to determine what are reasonable and just rates." *CUCA I*, 348 N.C. at 462, 500 S.E.2d at 701 (emphasis added).

The Attorney General argues that section 62-133, in conjunction with Chapter 62 as a whole, mandates that the Commission consider the impact of changing economic conditions on customers when determining ROE.  We agree.

"The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent."  *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 137 (1990).  This Court

previously has recognized that the legislature's "twin goals" in enacting section 62-133 were to "assur[e] sufficient shareholder investment in utilities while simultaneously maintaining the lowest possible cost to the using public for quality service." *CUCA I,* 348 N.C. at 458, 500 S.E.2d at 698. In addition, this Court has stated that "[t]he primary purpose of Chapter 62 of the General Statutes is not to guarantee to the stockholders of a public utility constant growth in the value of and in the dividend yield from their investment, but is to assure the public of adequate service at a reasonable charge." *State ex rel. Utils. Comm'n v. Gen. Tel. Co. of the Se.,* 285 N.C. 671, 680, 208 S.E.2d 681, 687 (1974). Moreover, this Court has explained that "[i]n its delegation of rate-making authority to the Commission, the legislature has established an elaborate procedural, hearing, and appeals process that contemplates the full consideration of *all* evidence put forth by each of the parties certified via the statute to have an interest in the outcome of contested proceedings." *CUCA I,* 348 N.C. at 463, 500 S.E.2d at 701 (emphasis added). "Once such considerations are afforded to all parties in a contested case, the Commission is required to embody its findings in an order sufficiently detailing the reasons for its determinations on *all* material and controverted issues of fact, law or discretion presented in the record." *Id.* (emphasis added) (citing N.C.G.S. § 62-94(b)).

It is undisputed that section 62-133 dictates that the Commission consider "changing economic conditions" when making an ROE determination. *See* N.C.G.S. § 62-133(b)(4). Although subdivision 62-133(b)(4) does not specifically reference

"impact on customers," subsection 62-133(a) does emphasize that fairness to customers is a critical consideration in rate cases by including a directive that "the Commission shall fix such rates as shall be fair both to the public utilities *and to the consumer.*" *Id.* § 62-133(a) (2011) (emphasis added). This is consistent with this Court's recognition of the customer-driven focus of Chapter 62 as a whole. *See Gen. Tel. Co.*, 285 N.C. at 680, 208 S.E.2d at 687. This Court previously has recognized that Chapter 62 "is a single, integrated plan. Its several provisions must be construed together so as to accomplish its primary purpose." *Id.* at 680, 208 S.E.2d at 687. Given the legislature's goal of balancing customer and investor interests, the customer-focused purpose of Chapter 62, and this Court's recognition that the Commission must consider *all* evidence presented by interested parties, which necessarily includes customers, it is apparent that customer interests cannot be measured only indirectly or treated as mere afterthoughts and that Chapter 62's ROE provisions cannot be read in isolation as only protecting public utilities and their shareholders. Instead, it is clear that the Commission must take customer interests into account when making an ROE determination. Therefore, we hold that in retail electric service rate cases the Commission must make findings of fact regarding the impact of changing economic conditions on customers when determining the proper ROE for a public utility.

For the foregoing reasons, we reverse the Commission's order and remand this case to the Commission with instructions to make an independent

determination regarding the proper ROE based upon appropriate findings of fact that weigh all the available evidence.

REVERSED AND REMANDED.

Justice BEASLEY did not participate in the consideration or decision of this case.