IN THE SUPREME COURT OF NORTH CAROLINA

No. 424A13

FILED 20 AUGUST 2014

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; DUKE ENERGY PROGRESS, INC., Applicant; and PUBLIC STAFF – NORTH CAROLINA UTILITIES COMMISSION, Intervenor

v.

ATTORNEY GENERAL ROY COOPER and THE NORTH CAROLINA WASTE AWARENESS AND REDUCTION NETWORK, Intervenors


On direct appeal as of right pursuant to N.C.G.S. §§ 62-90(d) and 7A-29(b) from a final order of the North Carolina Utilities Commission entered on 30 May 2013 in Docket No. E-2, Sub 1023. Heard in the Supreme Court on 5 May 2014.

*K&L Gates LLP, by Kiran H. Mehta; Heather Shirley Smith, Deputy General Counsel, and Charles A. Castle, Associate General Counsel, Duke Energy Progress, Inc.; and Williams Mullen, by Christopher G. Browning, Jr., for applicant-appellee Duke Energy Progress, Inc.*

*Antoinette R. Wike, Chief Counsel, and William E. Grantmyre and Lucy E. Edmondson, Staff Attorneys, for intervenor-appellee Public Staff – North Carolina Utilities Commission.*

*Kevin Anderson, Senior Deputy Attorney General; Phillip K. Woods and William V. Conley, Special Deputy Attorneys General; and Margaret A. Force, Assistant Attorney General, for intervenor-appellant Roy Cooper, Attorney General.*

*John D. Runkle for North Carolina Waste Awareness and Reduction Network, intervenor-appellant.*

JACKSON, Justice.

In this case we consider whether the order of the North Carolina Utilities Commission ("the Commission") authorizing a 10.2% return on equity ("ROE") for Duke Energy Progress ("DEP") contained sufficient findings of fact to demonstrate that it was supported by competent, material, and substantial evidence in view of the entire record. *See* N.C.G.S. § 62-94 (2013). Because we conclude that the Commission made sufficient findings of fact regarding the impact of changing economic conditions upon customers, we affirm. *See id.* § 62-94(b).

On 12 October 2012, DEP filed an application with the Commission requesting authority to increase its North Carolina retail electric service rates to produce an additional $359,000,000, yielding a net increase of 11% in overall base revenues. The application requested that rates be established using an ROE of 11.25%. The ROE represents the return that a utility is allowed to earn on its capital investment by charging rates to its customers. As a result, the ROE approved by the Commission affects profits for shareholders and costs to consumers. *State ex rel. Utils. Comm'n v. Cooper* ("*Cooper II*"), ___ N.C. ___, ___, 758 S.E.2d 635, 636 (2014) (citations omitted). The ROE is one of the components used in determining a company's overall rate of return. *Id.* at ___, 758 S.E.2d at 636 (citation omitted).

On 5 November 2012, the Commission entered an order declaring this proceeding a general rate case and suspending the proposed new rates for up to 270

days. The Commission scheduled five hearings across the State to receive public witness testimony. The Commission also scheduled an evidentiary hearing for 18 March 2013 to receive expert witness testimony. The Attorney General of North Carolina and the Public Staff of the Commission intervened as allowed by law. *See* N.C.G.S. §§ 62-15, -20 (2013).

On 28 February 2013, DEP and the Public Staff filed an Agreement and Stipulation of Settlement with the Commission. The Stipulation provided for a net increase of $178,712,000 in annual revenues and an ROE of 10.2%. Among the parties contesting the Stipulation was the Attorney General.

By the time the evidentiary hearing began on 18 March 2013, the Commission already had heard testimony from 127 public witnesses. Many of these customers opposed the proposed rate increase, testifying about unemployment and poverty in their communities. Other customers expressed their view that DEP should be required to discontinue fossil fuel and nuclear generation in favor of energy efficiency and renewable energy, even if doing so would result in higher costs.

The Commission also heard from expert witnesses, who testified about the appropriate ROE and explained how current economic conditions affect consumers. Specifically, DEP presented the testimony of Robert B. Hevert, Managing Partner of Sussex Economic Advisers, LLC. Hevert recommended an ROE of 11.25%, which

was above the midpoint of his recommended range of 10.50% to 11.50%. Hevert primarily used the Constant Growth Discounted Cash Flow model to compute his recommended ROE and considered the Capital Asset Pricing Model as a check on his results. Hevert also considered the effect of current economic conditions upon North Carolina customers. He testified that although North Carolina's unemployment rate was worse than the national average, the State's GDP growth and expected household income growth also were higher than the national average. Hevert noted that North Carolina's average residential electric prices were approximately 12.31% below the national average. He concluded that "the regional economic conditions in North Carolina were substantially similar to the United States, such that there is no direct effect of those conditions on the Company's cost of equity." As a result, Hevert determined that his ROE analysis did not need to be adjusted to account for the impact of changing economic conditions upon utility customers in this State.

The Public Staff presented the testimony of Ben Johnson, Consulting Economist and President of Ben Johnson Associates, Inc. Johnson estimated an ROE range utilizing two approaches: first, a comparable earnings approach, which arrived at a range of 9.75% to 10.75%; and second, a market approach, which arrived at a range of 7.72% to 8.95%. Johnson also addressed the prolonged period of economic weakness that began in 2007. Johnson stated that improvement in the economy has been both weak and slow, with firms still reluctant to either invest or

expand. Nevertheless, Johnson concluded that the proposed ROE of 10.2% agreed upon in the Stipulation was reasonable and consistent with the public interest.

Other interested parties also presented evidence to the Commission. The Carolina Utility Customers Association, Inc. ("CUCA"), a coalition of industrial energy customers, presented the testimony of Kevin O'Donnell, President of Nova Energy 3 Consultants, Inc., who recommended a specific ROE of 9.25%. In addition, the Commercial Group, an ad hoc group of Duke's commercial energy customers, presented the testimony of Steve Chriss, Senior Manager for Energy Regulatory Analysis for Wal-Mart Stores, Inc., and Wayne Rosa, Energy and Maintenance Manager for Food Lion, LLC. Chriss and Rosa did not recommend a specific ROE, but noted that Hevert's recommendation of 11.25% exceeded the range of recently authorized ROEs across the country.

The Attorney General did not present any ROE evidence.

On 30 May 2013, the Commission entered an order granting a $178,712,000 annual retail revenue increase and approving an ROE of 10.2% as agreed to in the Stipulation. In support of its conclusions, the Commission summarized the testimony of Hevert, Johnson, O'Donnell, Chriss, and Rosa. The Commission also recognized that it must consider whether the ROE is reasonable and fair to customers stating:

> [T]he Commission is required to consider the economic

> effects of its ROE decision on a public utility's customers pursuant to G.S. 62-133(b)(4). In particular, G.S. 62-133(b)(4) states, in pertinent part, that in fixing rates the Commission must fix a rate of return on the utility's investment that "will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, including, but not limited to . . . to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors." One of the "terms" on which a public utility competes in the market for capital funds is the utility's authorized ROE. Thus, the Commission must consider whether that term is reasonable and fair to the utility's customers.

(Second alteration in original.) The Commission concluded that the 10.2% ROE set forth in the Stipulation is "just and reasonable to all parties in light of all the evidence presented." The Attorney General appealed the Commission's order to this Court as of right pursuant to N.C.G.S. §§ 7A-29(b) and 62-90. The North Carolina Waste Awareness and Reduction Network filed a separate appeal supporting the Attorney General's position.

Subsection 62-79(a) of the North Carolina General Statutes "sets forth the standard for Commission orders against which they will be analyzed upon appeal." *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n* ("*CUCA I*"), 348 N.C. 452, 461, 500 S.E.2d 693, 700 (1998). Subsection 62-79(a) provides:

> (a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:

> (1) Findings and conclusions and the reasons or bases

-6-

> therefor upon all the material issues of fact, law, or discretion presented in the record, and
>
> (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (2013). When reviewing an order of the Commission, this Court may, *inter alia*,

> reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional provisions, or
>
> (2) In excess of statutory authority or jurisdiction of the Commission, or
>
> (3) Made upon unlawful proceedings, or
>
> (4) Affected by other errors of law, or
>
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
>
> (6) Arbitrary or capricious.

*Id.* § 62-94(b) (2013). Pursuant to subsection 62-94(b) this Court must determine whether the Commission's findings of fact are supported by competent, material, and substantial evidence in view of the entire record. *Id.*; *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 699 (citation omitted). "Substantial evidence [is] defined as more than a scintilla or a permissible inference. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CUCA I*, 348

N.C. at 460, 500 S.E.2d at 700 (alteration in original) (citations and quotation marks omitted). The Commission must include all necessary findings of fact, and failure to do so constitutes an error of law. *Id.* (citation omitted).

The Attorney General argues that the Commission's order is legally deficient because it is not supported by competent, material, and substantial evidence and does not include sufficient findings, reasoning, and conclusions. Specifically, the Attorney General contends that the Commission failed to make findings of fact showing in "meaningful detail" that it considered the impact of changing economic conditions upon customers when determining ROE. The Attorney General asserts that the Commission must "quantify" the extent to which it adjusted the final ROE to account for consumer interests. We disagree.

Pursuant to subdivision 62-133(b)(4) of the North Carolina General Statutes, the Commission must fix a rate of return that

> will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, . . . to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors.

N.C.G.S. § 62-133(b)(4). Recently, we observed that this provision, along with Chapter 62 as a whole, requires the Commission to treat consumer interests fairly, not indirectly or as "mere afterthoughts." *State ex rel. Utils. Comm'n v. Cooper*

("*Cooper I*"), 366 N.C. 484, 495, 739 S.E.2d 541, 548 (2013). In *Cooper I* the

Commission's order stated:

> Duke witness Hevert and Public Staff witness Johnson testified that it is not necessary to consider the impact of changing economic conditions on consumers in the context of an ROE economic analysis, other than in a broader macroeconomic sense, when analyzing changing market conditions for the purpose of making ROE recommendations. However, the Commission is required to consider the economic effects of its ROE decision on a public utility's customers pursuant to G.S. 62-133(b)(4). In particular, G.S. 62-133(b)(4) states, in pertinent part, that in fixing rates the Commission must fix a rate of return on the utility's investment that "will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, including, but not limited to . . . to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors." One of the "terms" on which a public utility competes in the market for capital funds is the utility's authorized ROE. Thus, the Commission must consider whether that term is reasonable and fair to the utility's customers. Public Staff witness Johnson testified in depth concerning the economic downturn, including the unemployment rate. In addition, the Commission received extensive testimony from public witnesses concerning the impact of current economic conditions on Duke's customers. Therefore, the Commission has ample evidence to consider in determining whether the proposed ROE of 10.5% is fair to Duke's customers.

(Ellipsis in original.) We explained that "the Commission must consider *all*

evidence presented by interested parties, which necessarily includes customers . . . .

[I]n retail electric service rate cases the Commission must make findings of fact

regarding the impact of changing economic conditions on customers when

determining the proper ROE for a public utility." *Id.* We concluded that the order did not contain sufficient findings addressing the impact of changing economic conditions upon customers. 366 N.C.at 494, 739 S.E.2d at 547. But contrary to the Attorney General's suggestion, we did not state in *Cooper I* that the Commission must "quantify" the influence of this factor upon the final ROE determination. *See id.*; *State ex rel. Utils. Comm'n v. Pub. Staff*, 323 N.C. 481, 498, 374 S.E.2d 361, 370 (1988) ("Given th[e] subjectivity ordinarily inherent in the determination of a proper rate of return on common equity, there are inevitably pertinent factors which are properly taken into account but which cannot be quantified with the kind of specificity here demanded by [the appellant].").

Here the Commission's order contains several findings of fact that address this factor:

> 16. Changing economic conditions in North Carolina during the last several years have caused high levels of unemployment, home foreclosures and other economic stress on DEP's customers.
>
> 17. The rate increase approved in this case, which includes the approved ROE and capital structure, will be difficult for some of DEP's customers to pay, in particular DEP's low-income customers.
>
> 18. Continuous safe, adequate and reliable electric service by DEP is essential to the support of businesses, jobs, hospitals, government services, and the maintenance of a healthy environment.
>
> 19. The ROE and capital structure approved by the Commission appropriately balances the benefits received

by DEP's customers from DEP's provision of safe, adequate and reliable electric service in support of businesses, jobs, hospitals, government services, and the maintenance of a healthy environment with the difficulties that some of DEP's customers will experience in paying DEP's increased rates.

20.  The 10.2% ROE and the 53% equity financing approved by the Commission in this case are as low as reasonably possible.  They appropriately balance DEP's need to obtain equity financing and maintain a strong credit rating with its customers' need to pay the lowest possible rates.

21.  The difficulties that DEP's low-income customers will experience in paying DEP's increased rates will be mitigated to some extent by the $20 million that DEP will contribute to assistance for low-income customers and job training.

The Commission also stated that it gave "great weight" to Hevert's testimony that, although North Carolina's unemployment rate was higher than the national average, the State enjoyed lower average electric rates, higher expected household income growth, and superior GDP growth as compared to the nation as a whole. The Commission noted that Johnson testified that improvement in the economy has been slow and that the state of the economy affects both investors and consumers. The Commission explained that in addition to submitting recommended ROE ranges, Johnson concluded that a 10.2% ROE was reasonable and consistent with the public interest in combination with other provisions in the Stipulation. Furthermore, the Commission found that 58 of the 127 public witnesses who testified at the hearings stated that "the rate increase was not affordable to many

customers," including the elderly, the unemployed or underemployed, the poor, and persons with disabilities. Nevertheless, the Commission explained that "[a]nother significant group of customers" wanted DEP to invest more in renewable energy, even if doing so would increase consumer costs.

In addition, the Commission found that specific provisions in the Stipulation serve customer interests. The Commission noted that the Stipulation required DEP to exclude from its rate base for one year the construction work in progress invested in the company's new Sutton power plant, thereby "making it easier for ratepayers to pay their electric bills in the current economic environment." The capital structure contained in the Stipulation allowed for less equity than DEP's actual capital structure during the test year, and the Commission observed that this adjustment lowered the rate paid by ratepayers, but increased the risk to debt holders and lowered the return for investors. Finally, the Commission noted that the distribution of $20,000,000 for assistance to low-income consumers and for job training benefited those ratepayers with the least ability to pay. These findings of fact not only demonstrate that the Commission considered the impact of changing economic conditions upon customers, but also specify how this factor affected the Commission's final order. Therefore, we hold that the Commission made sufficient findings regarding the impact of changing economic conditions upon customers and that these findings are supported by competent, material, and substantial evidence in view of the entire record.

Accordingly, the order of the Commission is affirmed.

AFFIRMED.