IN THE SUPREME COURT OF NORTH CAROLINA

No. 268A12-2

Filed 19 December 2014

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; DUKE ENERGY CAROLINAS, LLC, Applicant; PUBLIC STAFF – NORTH CAROLINA UTILITIES COMMISSION, Intervenor

v.

ATTORNEY GENERAL ROY COOPER, N.C. WASTE AWARENESS AND REDUCTION NETWORK, N.C. JUSTICE CENTER, and N.C. HOUSING COALITION, Intervenors

On direct appeal as of right pursuant to N.C.G.S. §§ 7A-29(b) and 62-90(d) from a final order of the North Carolina Utilities Commission on remand from this Court entered on 23 October 2013 in Docket No. E-7, Sub 989. Heard in the Supreme Court on 8 September 2014.

*K&L Gates LLP, by Kiran H. Mehta; Heather Shirley Smith, Deputy General Counsel, and Charles A. Castle, Associate General Counsel, Duke Energy Carolinas, LLC; and Williams Mullen, by Christopher G. Browning, Jr., for applicant-appellee Duke Energy Carolinas, LLC.*

*Antoinette R. Wike, Chief Counsel, and William E. Grantmyre and David T. Drooz, Staff Attorneys, for intervenor-appellee Public Staff – North Carolina Utilities Commission.*

*Kevin Anderson, Senior Deputy Attorney General; Phillip K. Woods, Special Deputy Attorney General; Michael T. Henry, Assistant Attorney General; and John F. Maddrey, Solicitor General; for intervenor-appellant Roy Cooper, Attorney General.*

*Law Offices of F. Bryan Brice, Jr., by Matthew D. Quinn, for NC WARN; and John D. Runkle for NC WARN, N.C. Justice Center, and N.C. Housing Coalition, intervenor-appellants.*

JACKSON, Justice.

In this case we consider whether the order of the North Carolina Utilities Commission ("the Commission") authorizing a 10.5% return on equity ("ROE") for Duke Energy Carolinas ("Duke") contained sufficient findings of fact to demonstrate that the order was supported by competent, material, and substantial evidence in view of the entire record. *See* N.C.G.S. § 62-94 (2013). Because we conclude that the Commission made sufficient findings of fact regarding the impact of changing economic conditions upon customers, we affirm. *See id.* § 62-94(b).

On 1 July 2011, Duke filed an application with the Commission requesting authority to increase its North Carolina retail electric service rates to produce an additional $646,057,000, yielding a net increase of 15.2% in overall base revenues. The application requested that rates be established using an ROE of 11.5%. The ROE represents the return that a utility is allowed to earn on the equity-financed portion of its capital investment by charging rates to its customers. As a result, the ROE approved by the Commission affects profits for shareholders and costs to consumers. *State ex rel. Utils. Comm'n v. Cooper* ("*Cooper II*"), 367 N.C. 430, 432, 758 S.E.2d 635, 636 (2014) (citations omitted). "The ROE is one of the components used in determining a company's overall rate of return." *Id.* (citation omitted).

The proceedings before the Commission are set forth in our opinion in *State ex rel. Utilities Commission v. Cooper* ("*Cooper I*"), 366 N.C. 484, 739 S.E.2d 541 (2013). In pertinent part, we explained that

> [t]he Commission entered an order on 28 July 2011, declaring this matter to be a general rate case and suspending the proposed rate increase pending further investigation. . . . The Attorney General of North Carolina and the Public Staff–North Carolina Utilities Commission intervened in this matter as allowed by law.
>
> On 28 November 2011, the Public Staff and Duke filed an Agreement and Stipulation of Settlement with the Commission that "provide[d] for a net increase of $309,033,000" for annual revenues and an allowed "ROE of 10.5%." The Settlement addressed all issues between Duke and the Public Staff, but was contested by some of the other parties, including the Attorney General.

*Id.* at 486, 739 S.E.2d at 542-43. Subsequently, the Commission conducted six hearings to receive testimony from public witnesses and an evidentiary hearing for receiving expert testimony. *Id.* On 27 January 2012, the Commission entered an order (the "Rate Order") approving the revenue increase and ROE contained in the Stipulation. 366 N.C. at 488, 739 S.E.2d at 544. The Attorney General appealed.

Upon review, we concluded that the Rate Order was not supported by sufficient findings of fact demonstrating that the Commission exercised independent judgment in approving the Stipulation's provisions. *Id.* at 493, 739 S.E.2d at 547. We explained that

> it does not appear that the Commission weighed any of the testimony presented at the evidentiary hearing. Instead, it appears that the Commission merely recited the witnesses' testimony before reaching an ROE conclusion in its order. Notably absent from the Commission's order is any discussion of why one witness's testimony was more credible than another's or which methodology was afforded the greatest weight.

*Id.* We further noted that the Rate Order did not include sufficient findings of fact regarding the impact of changing economic conditions upon customers. 366 N.C. at 494, 739 S.E.2d at 547. As a result, we reversed the Rate Order and remanded the case "with instructions to make an independent [ROE] determination . . . based upon . . . findings of fact that weigh all the available evidence." *Id.* at 496, 739 S.E.2d at 548.

On 23 October 2013, the Commission entered an order (the "Remand Order") making supplemental findings of fact, summarizing public witness testimony, reviewing expert testimony, explaining the weight given to the evidence, and "reaffirm[ing]" the Rate Order. The Commission concluded that the ROE authorized in the Rate Order was "justified and supported" by the evidence and was reasonable in light of the Stipulation as a whole. The Attorney General appealed the Remand Order to this Court as of right pursuant to N.C.G.S. §§ 7A-29(b) and 62-90.

Subsection 62-79(a) of the North Carolina General Statutes "sets forth the standard for Commission orders against which they will be analyzed upon appeal." *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n* ("*CUCA I*"), 348 N.C. 452, 461, 500 S.E.2d 693, 700 (1998). Subsection 62-79(a) provides:

> (a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:

(1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and

(2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (2013). When reviewing an order of the Commission, this Court may, *inter alia,*

> reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional provisions, or
>
> (2) In excess of statutory authority or jurisdiction of the Commission, or
>
> (3) Made upon unlawful proceedings, or
>
> (4) Affected by other errors of law, or
>
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
>
> (6) Arbitrary or capricious.

*Id.* § 62-94(b) (2013). Pursuant to subsection 62-94(b) this Court must determine whether the Commission's findings of fact are supported by competent, material, and substantial evidence in light of the entire record. *Id.*; *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 699 (citation omitted). "Substantial evidence [is] defined as more than a scintilla or a permissible inference. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 700 (alteration in original) (citations and quotation marks omitted). The Commission must include all necessary findings of fact, and failure to do so constitutes an error of law. *Id.* (citation omitted).

In his appeal,[1] the Attorney General argues that the Commission did not reach its own independent conclusions because the Remand Order "once again analyzes and critiques the expert testimony . . . in just such a way so as to reach—to the exact *tenth of a percent*—the precise compromise ROE contained in the Stipulation." The Attorney General asserts that the Commission supported the Remand Order by "cherry picking" through the available evidence, evidence from other cases, and orders entered in other jurisdictions. We disagree.

In *CUCA I* we explained that the Commission is required to reach an independent conclusion on a fair ROE. 348 N.C. at 461-62, 500 S.E.2d at 700-01. The Commission must consider all the evidence before it along with any stipulation entered into by some of the parties and any other relevant facts. *Id.* at 466, 500

---

[1] We note that NC WARN, the North Carolina Justice Center, and the North Carolina Housing Coalition did not file a notice of appeal with the Commission, although they filed a brief with this Court. Pursuant to section 62-90 of the North Carolina General Statutes, a party may appeal a final order of the Commission "if the party . . . shall file with the Commission notice of appeal and exceptions which shall set forth specifically the ground or grounds on which the aggrieved party considers said decisions or order to be unlawful, unjust, unreasonable or unwarranted." N.C.G.S. § 62-90(a) (2013). Because NC WARN, the North Carolina Justice Center, and the North Carolina Housing Coalition did not file a notice of appeal with the Commission, we are without jurisdiction to consider their arguments.

S.E.2d at 703. But the requirement that the Commission reach an independent conclusion does not preclude the Commission from adopting an ROE recommended by a particular party or witness. As we explained in *CUCA I*,

> [t]he Commission may even adopt the recommendations or provisions of the nonunanimous stipulation as long as the Commission sets forth its reasoning and makes "its own independent conclusion" supported by substantial evidence on the record that the proposal is just and reasonable to all parties in light of all the evidence presented.

*Id.*

In *Cooper I* we reversed the Rate Order because we were unable to conclude from the record that the Commission had considered all the evidence in addition to the Stipulation. *See* 366 N.C. at 493, 739 S.E.2d at 547. Specifically, we noted that the Rate Order did not weigh the evidence, but "merely recited the witnesses' testimony before reaching an ROE conclusion." *Id.* But in the Remand Order, the Commission revisited the evidence related to ROE and explained the weight given to each witness's testimony.

The Commission first reviewed the discounted cash flow ("DCF") analysis presented by Duke witness Robert Hevert. *See* 366 N.C. at 486-87, 739 S.E.2d at 543. The Commission explained that Hevert performed this analysis using several proxy groups and arrived at estimated ROE ranges of: (1) 10.42% to 10.84% for a proxy group he had selected; (2) 10.24% to 10.74% for a proxy group selected by

Public Staff witness Johnson; (3) 10.31% to 10.57% for one proxy group selected by CUCA witness O'Donnell; and (4) 10.27% to 10.58% for a second proxy group selected by O'Donnell. The Commission observed that the average midpoint of these ranges was exactly the stipulated 10.5%. Ultimately, the Commission "credit[ed]" Hevert's DCF analysis and found "that the resulting value provides substantial support for its determination that 10.5% is the appropriate [ROE]."

The Commission noted that Public Staff witness Ben Johnson had examined ROE through a comparable earnings method and a market approach. The Commission gave "substantial weight" to Johnson's comparable earnings method, which resulted in an ROE range of 9.75% to 10.75%, and determined that Johnson's analysis provided "ample support" for the Commission's conclusion that 10.5% was an appropriate ROE. Nevertheless, the Commission explained that Johnson had acknowledged that his market approach "does not focus on short-term securities markets at all; so the recent drop in interest rates and the drop in the opportunity to reach capital that is being signaled by security markets is simply not a part of that analysis." The Commission further explained that Hevert testified that Johnson's market analysis resulted in an "unreasonably low" ROE. The Commission determined that Johnson's market analysis was unpersuasive.

The Commission gave "minimal weight" to CUCA witness Kevin O'Donnell's testimony recommending an ROE of 9.5%. The Commission concluded that

O'Donnell inappropriately relied upon the assumed rate of return for Duke's pension expense, "ignor[ing] the crucial distinction between expected returns, which underlie pension expense, and required returns, which underlie the appropriate rate of return on equity."

In conducting its analysis, the Commission was required to consider the Stipulation together with all the other evidence and was permitted to adopt the ROE contained therein. *CUCA I*, 348 N.C. at 466, 500 S.E.2d at 703. We hold that the Remand Order contains sufficient findings of fact explaining the weight given to the evidence and demonstrating that the Commission reached its own independent conclusion on ROE.

Next, the Attorney General argues that the Commission determined that it "need not follow" this Court's decision in *Cooper I*. Specifically, the Attorney General contends that the Commission did not make sufficient findings of fact regarding the impact of changing economic conditions upon customers. We disagree.

Pursuant to subdivision 62-133(b)(4) of the North Carolina General Statutes, the Commission must fix a rate of return that

> will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, . . . to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory

covered by its franchise, and to compete in the market for capital funds on terms that are reasonable and that are fair to its customers and to its existing investors.

N.C.G.S. § 62-133(b)(4) (2013). In *Cooper I* we observed that this provision, along with Chapter 62 as a whole, requires the Commission to treat consumer interests fairly, not indirectly or as "mere afterthoughts." 366 N.C. at 495, 739 S.E.2d at 548. But although the Commission must make findings of fact regarding the impact of changing economic conditions upon consumers, "we did not state in *Cooper I* that the Commission must 'quantify' the influence of this factor upon the final ROE determination." *State ex rel. Utils. Comm'n v. Cooper* ("*Cooper III*"), 367 N.C. 444, 450, 761 S.E.2d 640, 644 (2014) (citations omitted).

Here the Commission's order contains several findings of fact that address this factor:

> 53. Economic conditions in North Carolina during the last several years have caused high levels of unemployment and other economic stress on [Duke's] customers.
>
> 54. The rate increase approved in this case, which includes, among the many authorized adjustments, the approved return on equity and capital structure, will be difficult for some of [Duke's] customers to pay, in particular [Duke's] low-income customers. . . .
>
> 55. Continuous safe, adequate, and reliable electric service by [Duke] is essential to the well-being of the people, businesses, institutions, and economy of North Carolina.

56. The return on equity approved by the Commission appropriately balances the benefits received by all of [Duke's] customers from [Duke's] provision of safe, adequate, and reliable electric service in support of the well-being of the people, businesses, institutions, and economy of North Carolina with the difficulties that a portion of [Duke's] customers experience in paying their bills in the current economic environment.

Furthermore, the Commission found that the Stipulation was "designed to mitigate the impact of the rate increase in several ways." First, the Commission explained that pursuant to the Stipulation, Duke's rates would increase by 7.21% across-the-board for all customer classes, which amounted to less than half the revenue increase that Duke originally sought. The Commission determined that an across-the-board increase, as provided in the Stipulation, resulted in a smaller increase for residential customers than an alternative rate design considered by the Commission. The Commission concluded that this approach was responsive to the concerns of public witnesses regarding the ability of residential customers to pay for a rate increase.

Second, the Commission noted that the Stipulation required Duke to defer recovery of costs associated with construction work in progress at Duke's Cliffside Unit 6. The Commission found that this requirement "provid[es] $51 million of relief in present rates to respond to the present economic straits." (Emphasis omitted.)

Finally, the Commission explained that the Stipulation required Duke to pay $11 million for energy assistance for low-income customers. As stated in the Stipulation, this contribution would come from Duke's shareholders and would be used exclusively to provide energy assistance to Duke's North Carolina retail customers.

These findings of fact not only demonstrate that the Commission considered the impact of changing economic conditions upon customers, but also specify how this factor influenced the Commission's decision to authorize a 10.5% ROE as agreed to in the Stipulation. These findings are supported by the evidence before the Commission, including public witness testimony, expert testimony, and the Stipulation itself. Therefore, we hold that the Commission made sufficient findings regarding the impact of changing economic conditions upon customers and that these findings are supported by competent, material, and substantial evidence in view of the entire record.

Accordingly, the order of the Commission is affirmed.

AFFIRMED.